# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

    Plaintiff,

    v.                                                 Case No. 14-CR-03

**MICHAEL ANGLIN,**

    Defendant.

## RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

On January 14, 2014, a grand jury sitting in the Eastern District of Wisconsin returned a single count indictment against defendant Michael Anglin. The indictment charges that Anglin, on or about December 17, 2013, possessed a firearm as a previously convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Anglin was arraigned on the charge and entered a plea of not guilty. Final pre-trial and jury trial are scheduled for May 20, 2014 and June 2, 2014 respectively before the Honorable Charles N. Clevert, Jr.

Before the Court is Anglin's motion to suppress. He argues that the police did not have probable cause to arrest him, in violation of the Fourth Amendment. He seeks to suppress the arrest and its fruits. The motion has been fully briefed and the Court heard oral argument on the motion on April 23, 2014. For the reasons that follow, I recommend that the defendant's Motion to Suppress be granted.

## FACTS

The facts are undisputed by the parties and are taken from the police reports. On December 10, 2013, ATF Special Agent Rick Hankins received a telephone call from an

individual who was later registered as ATF Criminal Informant 7884 ("CI"). (ATF Report No. 3, ¶ 1, Docket # 21-1.) The CI informed Agent Hankins that convicted felons Dave Anglin, and his brother, Michael Anglin, were actively recruiting him to commit armed robberies with them. (*Id.*) On December 13, 2013, Agent Hankins and Milwaukee Police Department Officer Tony Randazzo interviewed the CI. (ATF Report No. 1, ¶ 1, Docket # 21-1.) The CI stated that he was currently incarcerated with Dave Anglin in a federal halfway house in Milwaukee. (*Id.* ¶ 2.) A criminal history query for Dave Anglin later revealed that he was serving a federal prison sentence for bank robbery. (*Id.*) The CI stated that he and Dave Anglin had recently talked about their respective criminal histories involving armed robberies. (*Id.*) The CI further stated that Dave Anglin introduced the CI to his brother, Michael Anglin. (*Id.*) The CI stated that he befriended the Anglin brothers and that the Anglin brothers trusted him. (*Id.* ¶ 3.) The CI provided law enforcement with the Anglin brothers' cell phone numbers. (*Id.*)

The CI told law enforcement that the Anglin brothers had recently asked the CI to join them in conducting robberies. (*Id.* ¶ 4.) The CI stated that Dave Anglin was "eager" to conduct any kind of robbery because he did not have any money. (*Id.*) The CI further stated that both Anglins had asked the CI to take an active role in future robberies by asking the CI to carry a firearm, which would be supplied by the Anglin brothers. (*Id.*) Specifically, the CI said the Anglins showed him two black assault rifles and one black Glock pistol inside a vehicle driven by Michael Anglin on either December 7, 2013 or December 8, 2013. (*Id.*) The CI stated that the assault rifles were in the back seat and the Glock pistol was on Michael Anglin's person. (*Id.*) The CI did not enter the vehicle, which he described as a silver or grey crossover SUV. (*Id.*) However, the CI had been a passenger in the silver/grey

SUV in the past, which was driven by Michael Anglin. (*Id.* ¶ 5.) The silver/grey SUV was identified in Report No. 3 as a silver Acura MDX. (Report No. 3, ¶ 8.) The CI also stated that on one occasion he rode in the Acura with the Anglins to an apartment complex where Michael Anglin said he lived. (Report No. 1, ¶ 8.) Agent Hankins later conducted a records query and found the Anglins' mother lived at the apartment complex where the CI said Michael Anglin lived. (*Id.* ¶¶ 8-9.)

The CI stated that the Anglin brothers were pressuring him to help them conduct robberies and that Dave Anglin would prefer to rob a bank because he wanted the "big payday." (*Id.* ¶ 6.) The CI also stated that Dave Anglin claimed there was a drug dealer that he could rob as well. (*Id.*) The CI stated that Dave Anglin was sometimes picked up from the half-way house in a white Escalade driven by Dave Anglin's girlfriend. (*Id.* ¶ 7.) On December 16, 2013, ATF Special Agent Kenneth Handy observed a black male matching Dave Anglin's description enter a white Escalade matching the description given by the CI. (*Id.*)

Agent Hankins and Officer Randazzo instructed the CI to tell the Anglin brothers that he knew of a person who could help them select an armed robbery target. (Report No. 3, ¶ 2.) Investigators intended to have an undercover agent subsequently meet the Anglin brothers in an effort to better predict and interdict any future violent acts by the Anglin brothers. (*Id.*) On December 16, 2013, Agents Hankins and Handy met with the CI, who stated that the Anglin brothers told him that they did not want to meet anyone outside their trusted circle, because they feared being caught in a law enforcement sting. (*Id.* ¶ 3.) The CI stated that the Anglin brothers insisted that the three of them randomly pick a target that the

Anglin brothers had previously researched. (*Id.*) The CI stated Dave Anglin wanted to rob "something" within a couple of days. (*Id.*)

In an effort to identify the robbery locations targeted by the Anglins, investigators instructed the CI to encourage the Anglins to show the CI specific robbery target locations prior to any robbery attempt. (*Id.*) The CI had stated that conversations with the Anglin brothers had occurred either in a secure facility or at unpredictable times. (*Id.*) Thus, Agent Hankins provided an Olympus digital recording device to the CI in an attempt to capture any conversation between the CI and the Anglin brothers regarding potential criminal activity. (*Id.*)

On December 17, 2013 at approximately 5:00 a.m., Agent Hankins received a text message from the CI which read, "They trying to do something in the morning[,] what I do [?]" (*Id.* ¶ 4.) Agent Hanks then called the CI and the CI stated that Dave Anglin was determined to conduct an armed robbery that morning after he was released from the half-way house. (*Id.* ¶ 5.) The CI stated that Dave Anglin wanted the CI to participate in the armed robbery. (*Id.*) Agent Hankins instructed the CI to go with the Anglins on the attempted armed robbery so that the CI could notify law enforcement of the movement and activities of the Anglin brothers. (*Id.*) Agent Hankins informed the CI that law enforcement would need to intervene at some point if overt actions were taken by the suspects. (*Id.*)

On December 17, 2013 at approximately 5:35 a.m., Agent Hankins located the Acura at the apartment complex where the CI stated Michael Anglin lived. (*Id.* ¶ 8.) Agent Hankins parked his vehicle approximately 30 feet from the Acura. (*Id.*) Agent Hankins then called FBI Special Agent Ben Hruz for assistance in conducting surveillance of the suspect vehicle. (*Id.*) Agent Hruz arrived between 6:00 a.m. and 6:45 a.m. (*Id.*) At approximately

8:05 a.m., Agent Hankins observed a black male, who matched the booking photograph of Michael Anglin, approach the Acura. (*Id.* ¶ 9.) Agent Hankins saw Michael Anglin first go to the passenger side of the vehicle, and then walk back towards the driver's side. (*Id.*) The Acura subsequently backed out of its parking spot and began traveling east. (*Id.*) The agents lost sight of the Acura due to traffic congestion and excessive speed of the Acura. (*Id.*)

While Agent Hankins was monitoring the Acura in the parking lot, he had telephone contact with the CI, who informed Agent Hankins that Dave Anglin had left the half-way house shortly after 8:00 a.m. (*Id.* ¶ 10.) The CI called Dave Anglin, asking where he was, to which Dave Anglin responded that he needed to shovel snow or do something for his girlfriend. (*Id.*) Dave Anglin further told the CI that after he finished with his girlfriend, he would be meeting the CI and Michael Anglin so they could team up for an armed robbery. (*Id.*) The CI also said that Dave Anglin told the CI that Michael Anglin would be picking the CI up from the half-way house. (*Id.*) The CI stated that he called Michael Anglin and Michael Anglin confirmed that he would be picking the CI up to conduct a robbery. (*Id.*)

The CI informed Agent Hankins that one of the Anglin brothers told him that the target of their robbery was going to be a drug house near 74th Street and Capitol Drive in Milwaukee. (*Id.* ¶ 11.) The CI also informed Agent Hankins that Dave Anglin had told him to be on the lookout for a black Dodge Charger that looked like a "fed" vehicle, which was parked near the half-way house when Dave Anglin left the facility earlier that morning. (*Id.* ¶ 12.) The CI stated that Dave Anglin told him to wait for Michael Anglin at the corner of Fond du Lac Avenue and Center Street. (*Id.*) At approximately 8:25 a.m. several surveillance units from ATF and the Milwaukee Police Department congregated in the area of Fond du Lac Avenue and Center Street. (*Id.* ¶ 13.) By approximately 8:40 a.m., Agent

5

Hankins observed the CI standing on the north side of Center Street, east of Fond du Lac Ave. (*Id.* ¶ 14.) Agent Hankins called the CI and instructed him to turn on his recording device before getting into the Acura with Michael Anglin. (*Id.*)

At approximately 8:48 a.m., Agent Hankins observed the Acura approach the CI from the east on Center Street. (*Id.* ¶ 15.) The Acura stopped and the CI got into the front passenger seat. (*Id.*) An agent initially followed the Acura; however, traffic congestion made it difficult to maintain a close surveillance. (*Id.*) In an effort to protect the public based on the threat of an armed robbery, Agent Hankins requested that the Milwaukee Police Department stop the Acura. (*Id.*) The Acura was stopped at approximately 8:55 a.m. (*Id.*) The vehicle's occupants were "tactically taken into custody" and the vehicle was impounded and later searched pursuant to a federal search warrant. (*Id.*)

Based on "the continued threat of an armed robbery," law enforcement congregated near the home address of Dave Anglin's girlfriend, and later apprehended Dave Anglin as he attempted to get into the driver's seat of a white Escalade. (*Id.* ¶ 16.)

## ANALYSIS

Anglin moves to suppress evidence seized as a result of his arrest. Specifically, subsequent to Anglin's arrest, officers obtained a federal search warrant and, pursuant to that warrant, recovered a firearm from his vehicle that forms the basis of the charge against him. The parties agreed at oral argument that without the information obtained as part of Anglin's arrest, the search warrant lacks probable cause.

The only issue before the Court is whether there was probable cause to support Michael Anglin's arrest. Anglin argues the officers did not have probable cause to arrest him. Further, the defendant argues the CI, who provided the information that served as the

basis for the arrest, was unreliable and uncorroborated. The government concedes that this is a close call. However, the government argues that there was probable cause to arrest Anglin for conspiracy to commit armed robbery. Alternatively, the government argues that exigent circumstances justified Anglin's arrest. Finally, the government argues that if probable cause is lacking, then the Court, in its discretion, should not exercise the exclusionary rule in this case. I will address each issue in turn.

   1.   *Probable Cause*

The Fourth Amendment protects persons against "unreasonable searches and seizures" and against arrests without probable cause. U.S. Const. Am. IV. Whether an arrest is constitutionally valid depends upon whether "at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Determinations of probable cause are naturally based on probabilities, and a finding of probable cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003) (internal quotation and citation omitted). In making probable cause determinations, law enforcement agents are entitled to draw reasonable inferences from the facts before them, based on their training and experience. *Id.* To determine whether an officer had probable cause to arrest an individual, the court examines the events leading up to the arrest, and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer,

amount to" probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation and citation omitted).

Probable cause is dependent upon both the content of the information possessed by the police and its degree of reliability. *Alabama v. White*, 496 U.S. 325, 330 (1990). Both factors—quantity and quality—are considered in the totality of the circumstances. *Id.* If a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion that would be required if the tip were more reliable. *Id.* The Supreme Court has also stated that "[o]ur decisions applying the totality-of-the-circumstances analysis . . . have consistently recognized the value of corroboration of details of an informant's tip by independent police work." *Illinois v. Gates*, 462 U.S. 213, 241 (1983).

With these established principles in mind, I turn to this case. In my view, at the point that the police stopped the Anglin vehicle, the police had reasonable suspicion pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), to stop the vehicle to dispel or confirm whether criminal activity was afoot, but they did not have probable cause to arrest. The government is correct that the fact that the CI came forward of his own accord and was willing to wear a wire lends credence to the CI's story. Dave Anglin's prior conviction for bank robbery would also raise a red flag with the police. But was what the police knew at the time of the arrest sufficient to justify an arrest?

As stated earlier, in assessing probable cause, the Court must consider the facts as known to the police at the time of the arrest. Information obtained after the arrest, no matter how compelling, does not inform the probable cause inquiry. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999) ("The existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently-received information."). At

the time that the police stopped the vehicle, the CI had informed the police that the Anglins wanted to do an armed robbery and wanted to do it that day. The initial information the police had was that the target of the robbery would be a bank because Dave Anglin wanted a "big payday" and later it was to be of an unidentified drug dealer near 74th and Capitol. At the time of the stop, the police had corroborated or observed the following facts: Dave Anglin is serving a federal prison sentence for bank robbery at the same halfway house as the CI; Michael Anglin lives in his mother's apartment; Michael Anglin drives a silver Acura registered to his mother; Dave Anglin drives a white Escalade registered to his girlfriend, whose name is Starmiqua Broom, and police observed Dave Anglin get into the Escalade on December 16, 2013; Michael Anglin would pick the CI up at the corner of Fond du Lac Avenue and Center Street and police observed Michael Anglin pick the CI up at this location; and Michael Anglin's vehicle traveled north on Fond du Lac Avenue after picking up the CI.

In making a determination of probable cause, the inquiry is not whether the activity considered is innocent or criminal; rather, it is the degree of suspicion that attaches to the actions. *See Gates*, 462 U.S. at 243 n.13 ("[I]nnocent behavior frequently will provide the basis for a showing of probable cause . . ."). In this case, the totality of the circumstances does not amount to probable cause. The corroborated facts about the Anglin brothers' vehicles, residences, and the name of Dave Anglin's girlfriend have a low degree of suspicion. Even the fact that the CI was correct about the rendezvous point of Fond du Lac Avenue and Center Street is insufficient to establish probable cause. Although it is true that knowledge of one's itinerary can show an informant has "inside information" and thus is likely to also have access to reliable information about that person's illegal activities, *see*

9

*White*, 496 U.S. at 332, the corroboration of this single fact in context of the totality of what was known to the police at the point of arrest does not tip the scale towards a finding of probable cause. Further, the fact Michael Anglin's car started driving in the general direction of the alleged target drug house near 74th and Capitol (which encompasses a wide area, not just a couple of houses or mere blocks) does not lend support to a finding of probable cause as Anglin's vehicle could have been traveling towards a great many destinations in the general northbound direction.

The lack of probable cause in this case is more apparent when compared to the facts of *United States v. Foster*, 478 F.2d 1001 (7th Cir. 1973),[1] where the court found probable cause to make a warrantless arrest based on a tip from an untested informant. In *Foster*, police received a tip that a bank in the vicinity of Elkhart County, Indiana was going to be robbed. *Id.* at 1002. The bank was not identified by name but was said to be located near a gymnasium. *Id.* The informant told police that the men to be involved in the purported robbery were going to be armed, wearing wigs, and riding in a 1959 white Buick. *Id.* Of the three men who were to participate in the crime, two were white and one was black. *Id.* The informant identified the alleged robbers by name and told police that the robbery was to take place at about 3 p.m. that afternoon. *Id.* The informant told police he learned this information by overhearing a conversation between the three men in the informant's home. *Id.*

The police were dispatched to various banks in the area. *Id.* Officers situated outside a bank located in Elkhart County near a gymnasium observed two suspicious men enter the

---

[1] I note that *Foster* was decided prior to the Supreme Court's decision in *Gates* in which the Court abandoned the two-pronged test for probable cause derived from *Spinelli v. United States*, 393 U.S. 410 (1969) and adopted a totality-of-the-circumstances approach. Despite this fact, I find the *Foster* court's analysis of the facts and circumstances lending support for a finding of probable cause instructive.

bank. *Id.* at 1002-03. One man was white and one was black and they were wearing large, floppy hats and sun glasses. *Id.* An officer inside the bank observed the men walk around the bank for awhile, one getting into a teller line and then out of the line on two separate occasions. *Id.* at 1003. The men appeared very nervous and had two brief conversations during the time one of them was getting in and out of the teller lines. *Id.* During the latter conversation, one of the men was looking out of the window and appeared to be focusing on an unmarked police car in front of the bank (the unmarked vehicle had a radio antenna protruding from the trunk and was equipped with a red-lens spotlight). *Id.* The officer inside the bank heard one of the men say something to the effect that someone had "ratted" or "squealed." *Id.* The two men hurriedly left the bank and began walking at a very rapid pace. After following the two men for a short period of time, they were arrested. *Id.*

In finding probable cause to support the warrantless arrest, the court observed that the informant provided the officers with a wealth of detail concerning the circumstances of the purported robbery; described the purported robbers by name, race, and dress; and gave a general location of the robbery and a specific time. *Id.* at 1004. The court further noted that the details were corroborated in almost every respect by the arresting officers and the informant had advised the officers of the manner in which he acquired the information concerning the predicted robbery. *Id.*

In contrast, the uncorroborated facts given by the CI in this case are vague. The CI initially told police that Dave Anglin told him he wanted to rob "something" and conduct the robbery "within a couple of days." On December 17, 2013, the CI informed police that the robbery would take place that morning and the supposed target was "a drug house near 74th and Capitol" in Milwaukee, but the CI did not know the exact street or address.

Although the police observed Michael Anglin pick the CI up and head north on Fond du Lac Avenue (which is the general direction towards 74th and Capitol), the police stopped Michael Anglin's vehicle approximately 7 minutes later, around 41st Street and Fond du Lac Avenue. Recall the alleged co-conspirator to the armed robbery, Dave Anglin, had not been picked up or joined Michael Anglin at this point. Although probable cause does not require the kind of certainty necessary for proof beyond a reasonable doubt, unlike in *Foster* where the officers observed suspicious behavior in the bank—the alleged target of the robbery—the only allegedly suspicious behavior observed by police in this case was the CI getting picked up by Michael Anglin and Michael Anglin traveling in the general direction of a non-specific target. This is not to say that the police had to wait until Anglin arrived at the drug house or until the armed robbery was completed to arrest. But given that the CI was untested, more police corroboration or police observation of suspicious activity was necessary to support a warrantless arrest. As such, the facts and circumstances the police knew at the time of Michael Anglin's arrest were insufficient to support the belief that Michael Anglin had committed or was committing conspiracy to commit an armed robbery. Thus, the police did not have probable cause to arrest Michael Anglin.

As an alternative basis for probable cause to arrest, the government argues that the police observed Anglin commit a traffic violation. Specifically, in its brief, the government makes a passing remark that after the police activated their emergency lights and siren, Anglin did a U-turn and headed south on Fond du Lac Avenue "in what could only have been an attempt to elude the officers (itself a crime)." (Docket # 23 at 8.) At oral argument, the government reiterated that Anglin's alleged attempt to elude the officers was an alternate basis giving officers probable cause to arrest Anglin. Indeed, it is established law that police

may reasonably conduct a warrantless stop if they have probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996). Moreover, the Supreme Court has held that the Fourth Amendment does not prohibit a warrantless arrest even for a minor traffic offense. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). The question, thus, for the Court, is whether the police had probable cause to believe that a traffic violation had occurred. It does not matter that the violation did not actually occur. *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005).

Relevant here, Wisconsin traffic law prohibits a driver from fleeing or attempting to elude the police. Wis. Stat. § 346.04(3).[2] In this case, the entirety of the police report on this issue states that Michael Anglin did not immediately stop his vehicle and instead did a "slow u-turn" and began driving south on Fond du Lac Avenue, at which point the vehicle was blocked by a Milwaukee Police Department vehicle and came to a stop. (Report No. 3 at ¶ 15). Although the police's response of blocking Anglin's vehicle suggests a belief that Anglin was attempting to flee or elude, on this sparse record, I cannot make a determination that the police objectively believed that Anglin was fleeing. The government, who bears the burden, has not developed this argument and upon this record, there are insufficient facts to determine whether the police had probable cause to believe that a traffic violation had

---

[2] Wis. Stat. § 346.04(3) reads:

> No operator of a vehicle, after having received a visual or audible signal from a traffic officer, or marked police vehicle, shall knowingly flee or attempt to elude any traffic officer by willful or wanton disregard of such signal so as to interfere with or endanger the operation of the police vehicle, or the traffic officer or other vehicles or pedestrians, nor shall the operator increase the speed of the operator's vehicle or extinguish the lights of the vehicle in an attempt to elude or flee.

13

occurred. Accordingly, I cannot find that the alleged traffic violation established probable cause for Anglin's arrest.

   2.   *Exigent Circumstances*

Alternatively, the government argues that exigent circumstances supported Anglin's warrantless arrest. The government argues that because the police were having difficulty maintaining surveillance of Anglin's car and because the police believed the vehicle was en route to a drug house to commit an armed robbery, the situation invoked hot pursuit and public safety concerns justifying the warrantless arrest.

The exigent circumstances doctrine creates an exception to the Fourth Amendment prohibition against warrantless searches and seizures. *See Michigan v. Tyler*, 436 U.S. 499, 509 (1978). Exigent circumstances arise "when there is a combination of 'a compelling need for official action and no time to secure a warrant.'" *United States v. Escobedo*, 397 Fed. Appx. 205, 208 (7th Cir. 2010) (unpublished) (quoting *Tyler*, 436 U.S. at 509). In the case of warrantless arrests, the exigent circumstances exception generally pertains to warrantless arrests inside the home and requires a finding of probable cause. *See United States v. Madewell*, 917 F.2d 301, 305 (7th Cir. 1990) (internal citations omitted) ("[W]hile warrantless arrests inside a suspect's home are generally prohibited by the [F]ourth [A]mendment, the presence of exigent circumstances, when twinned with probable cause, excuses the absence of an arrest warrant."). Among the recognized exigent circumstances are: when officers must "step in to prevent serious injury and restore order," *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010) (internal quotations and citation omitted); when "police reasonably believe[d] that their safety, or the safety of the public, may be threatened," *id.*; the police must prevent the imminent destruction of evidence, *Escobedo*, 397

14

Fed. Appx. at 208; or where the officers are in "hot pursuit" of a fleeing subject, *Kentucky v. King*, ––– U.S. –––, 131 S. Ct. 1849, 1856 (2013).

The government concedes that this situation does not present hot pursuit "in the classic sense" (Docket # 23 at 10); instead, the government argues that the officer's difficulty following Michael Anglin's car, coupled with the alleged threat of an armed robbery, justified the arrest. For the reasons discussed earlier, I do not find the requisite probable cause. Moreover, the law does not provide for the general exception to the warrant requirement advocated by the government. As the government concedes, this situation does not amount to "hot pursuit" of a fleeing subject. Further, the general concern for public safety because of an armed robbery that might occur of an unknown target at an unknown location does not create the kind of imminent danger justifying Anglin's warrantless arrest. Thus, the government has not shown an exigent circumstance justified Anglin's warrantless arrest.

    3.    *Exclusionary Rule*

Finally, the government argues that even if the evidence here falls short of probable cause, the circumstances of this case do not justify suppression of evidence, relying on *Davis v. United States*, ––– U.S. –––, 131 S. Ct. 2419 (2011) and *Herring v. United States*, 555 U.S. 135 (2009). At oral argument, the government acknowledged that *Davis* and *Herring* had not been extended to cases such as this one; however, the government argues that the Court's language in those cases is sufficiently broad to encompass the facts of this case. *Davis* does contain broad language regarding the fact that exclusion of evidence exacts a "heavy toll on both the judicial system and society at large" and must be a "last resort" for those situations in which "the deterrence benefits of suppression [ ] outweigh its heavy cost." *Davis*, 131 S.

Ct. at 2427. But, the *Davis* Court still ties the "good faith" exception to the cases starting with *United States v. Leon*, 468 U.S. 897 (1984), and its progeny. In these cases, the officers were relying on, for example, a warrant ultimately found to be invalid, *Leon*, 468 U.S. at 920-22; an erroneous warrant record in a government database, *Herring*, 555 U.S. at 137; and searches conducted in reasonable reliance on subsequently invalidated statutes, *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987). In *Davis* itself, the officers were relying on binding appellate precedent in conducting their search. 131 S. Ct. at 2428.

Similarly, the government is correct that in *Herring* the Court broadly stated that the exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence" on the part of the police, 555 U.S. at 144. However, the police in *Herring* were also relying on what they believed was an outstanding arrest warrant, although the belief turned out to be wrong because of a negligent bookkeeping error by another police employee.

Accordingly, I do not read the broad language contained in *Davis* and *Herring* to justify warrantless arrests based on a police officer's good intentions to protect the public from a potential armed robbery. To be clear, by finding that the good faith exception does not apply, I am not saying that the police officers acted in a way deserving of punishment, and I appreciate the fluidity of the situation the officers faced. However, in evaluating the dictates of the Fourth Amendment, I cannot extend the good faith exception beyond a police officer's good faith reliance on a judicial or legislative action to a situation where an officer relies on his own good faith belief that he is doing the right thing. Therefore, I do not find the good faith exception to the exclusionary rule applies under the facts and circumstances of this case.

**NOW, THEREFORE, IT IS RECOMMENDED** that the defendant's motion to suppress (Docket # 21) be **GRANTED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), and Federal Rule of Criminal Procedure 59(b)(2) (as amended effective December 1, 2009), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal.

Dated at Milwaukee, Wisconsin this 28th day of April, 2014.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge